UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **HERMINIO VALLE AND LUZ VALLE**<br><br>Plaintiffs,<br><br>v.<br><br>**NATIONSTAR MORTGAGE, LLC, D/B/A RUSHMORE SERVICING AND SELECT PORTFOLIO SERVICING, INC.**<br><br>Defendant. | **JURY TRIAL DEMANDED**<br><br>**CIVIL ACTION NO:**<br><br><br><br>**OCTOBER 2, 2025** |

## COMPLAINT

The Plaintiffs Herminio and Luz Valle, through their attorneys, file this Complaint against Defendants Nationstar Mortgage, LLC d/b/a Rushmore Servicing ("Rushmore") and Select Portfolio Servicing, Inc. ("SPS") and in support thereof allege as follows:

### INTRODUCTION

1. This is an action for damages, costs, and attorney's fees arising out of Defendants' unfair, deceptive, and reckless servicing of Mr. and Mrs. Valle's loan, misconduct which has persisted from at least 2022 until present day. Mr. and Mrs. Valle seek relief pursuant to the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2601, *et seq*. ("RESPA") and the regulations promulgated thereunder ("Regulation X"), the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq*. ("CUTPA"), and breach of contract.

### JURISDICTION AND VENUE

2. This Court has diversity jurisdiction over the parties pursuant to 28 U.S.C. § 1332 as the parties are citizens of diverse states and the amount in controversy exceeds $75,000.

3. The Court also has subject matter jurisdiction pursuant to 12 U.S.C. § 2614 and 28 U.S.C. § 1331 as Count III of this action arises under RESPA.

4. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the state law claims under Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq.*, breach of contract, and negligent misrepresentation.

5. Venue in this District is proper as Mr. and Mrs. Valle reside in Hartford, Connecticut. Both Rushmore and SPS transact business within the State of Connecticut, and the conduct complained of occurred in this District.

## PARTIES

6. Mr. and Mrs. Valle are natural people under CUTPA pursuant to Conn. Gen. Stat. § 42-110a(3).

7. Defendant Nationstar Mortgage, LLC d/b/a Rushmore Servicing is a Delaware corporation engaged in the business of servicing mortgage loans in Connecticut, with its principal place of business located at 8950 Cypress Waters Boulevard, Coppell, Texas 75019.

8. Defendant Select Portfolio Servicing, Inc. is a Utah corporation engaged in the business of servicing mortgage loans in Connecticut, with its principal place of business located at 3217 S. Decker Lake Drive, Salt Lake City, Utah 84119.

9. Mr. and Mrs. Valle's loan is a federally related mortgage as defined by 12 U.S.C. § 2602(1) in that the loan is secured by a first lien on two-family unit of residential real property and was made by the lender satisfying requirements of 12 U.S.C. § 2602(1)(B)(i) or a creditor satisfying requirements of 12 U.S.C. § 2602(1)(B)(i)(iv).

10. Defendant Rushmore is the former loan servicer of the Valles' mortgage for the purposes of 12 U.S.C. § 2605.

11. Defendant SPS is the current loan servicer of the Valles' mortgage for the purposes of 12 U.S.C. § 2605.

## FACTUAL ALLEGATIONS

12. Mr. and Mrs. Valle own a multi-family home at 489-491 Zion Street, Hartford, Connecticut 06106.

13. Mr. and Mrs. Valle became the sole owners of 489-491 Zion Street, Hartford, Connecticut, their family home on October 19, 1995, and have remained the sole owners to the present day.

14. Defendant Rushmore became the servicer of the note and mortgage sometime before 2021.

15. Defendant SPS became the servicer of note and mortgage in March 2024.

16. SPS and Rushmore are both subject to mortgage servicing rules promulgated by the Consumer Financial Protection Bureau (CFPB).

17. In August 2022, Rushmore commenced a foreclosure against Mr. and Mrs. Valle in Connecticut Superior Court following a disagreement between the parties regarding escrow payments for taxes and insurance.

18. Mr. and Mrs. Valle participated in the foreclosure mediation program for over a year to negotiate a loan workout with Rushmore.

**I.     Rushmore Failed to Release Insurance Proceeds.**

19. During this time, Rushmore held $25,378.59 in insurance proceeds that were due to Mr. and Mrs. Valle from a claim they made to their homeowner's insurance after sustaining significant water damage to their home.

20. The insurer made the check payable to both Mr. and Mrs. Valle and Rushmore.

21. Mr. and Mrs. Valle contacted Rushmore and were instructed to sign the check and send it to Rushmore. They were advised by Rushmore that it would endorse the check and send it back to them for deposit.

22. After commencing the foreclosure, Rushmore withheld the insurance check from Mr. and Mrs. Valle without explanation.

23. Mr. and Mrs. Valle sought release of the insurance proceeds from Rushmore for over a year while in foreclosure mediation.

24. Mr. and Mrs. Valle provided Rushmore with all the documents it requested including a repair affidavit, indemnification form, and contractor agreement. Nonetheless, Rushmore refused to release the insurance proceeds without providing the Valles a reason or justification.

25. Mr. and Mrs. Valle could not remediate the water damage in their home until May 2024, when SPS, having taken over servicing, finally endorsed the insurance check and sent it to Mr. and Mrs. Valle.

26. SPS released the insurance proceeds to Mr. and Mrs. Valle 14 months after the insurer issued the check.

27. The water damage to the home significantly impaired both Mr. and Mrs. Valle's use and enjoyment of their primary residence and the habitability of the rental unit located on the same property.

II. **Rushmore Delayed the Reinstatement of the Valles' Mortgage for Three Months.**

28. In December 2023, while in mediation, Mr. and Mrs. Valle were approved for the state's pandemic relief program, MyHomeCT, which was administered by the Connecticut Housing Finance Authority (CHFA).

29. At the time of approval, CHFA requested a reinstatement figure for Mr. and Mrs. Valle's

4

mortgage from Rushmore.

30. In February 2024, three months after CHFA's request, Rushmore provided Mr. and Mrs. Valle with a mortgage reinstatement figure.

### III. SPS Took Over Servicing and the Valles Reinstated Their Mortgage.

31. On March 6, 2024, SPS took over servicing of the Valles mortgage from Rushmore.

32. On March 19, 2024, CHFA sent $50,000 in MyHomeCT funds to SPS to be applied to Mr. and Mrs. Valle's arrears.

33. Simultaneously, and in accordance with the reinstatement they received from it, Mr. and Mrs. Valle wired SPS an additional $23,744.57 to complete the full reinstatement.

34. Together, the payments constituted full reinstatement of Mr. and Mrs. Valle's mortgage through March 31, 2024, including all outstanding, principal, interest, and escrow payments.

35. On April 29, 2024, Mr. and Mrs. Valle called SPS to find out what their new monthly payment amount would be and to make their first post-reinstatement payment.

36. SPS informed Mr. and Mrs. Valle that the reinstatement of the mortgage was not fully processed, but that their account status was "current" and their new monthly payment was $2,122.77.

37. SPS indicated that the $2,122.77 payment included principal, interest, taxes and insurance.

38. Mr. and Mrs. Valle made their April 2024 payment shortly thereafter.

### IV. SPS Increased the Valles' Mortgage Payment in May 2024.

39. In May 2024, SPS informed Mr. and Mrs. Valle that their payment was now $2,805.94 but provided them no explanation as to the substantial payment increase.

40. Mr. and Mrs. Valle made their usual $2,122.77 payment and sent SPS a notice of error

under RESPA, Regulation X, 12 C.F.R. § 1024.35, asking it to correct its errors in escrow calculation.

41. Mr. and Mrs. Valle believed SPS had miscalculated their property taxes, doubling their escrow payment as a result.

42. In July 2024, SPS responded to Mr. and Mrs. Valle's notice of error indicating that the payment increase was due to a negative escrow balance of $25,255.01, which allegedly existed at the time the mortgage was transferred to SPS.

43. In August 2024, Mr. and Mrs. Valle sent SPS a second notice of error to explaining that the reinstatement payment they made in March 2024 (at the behest of Rushmore Servicing) should have fully funded any escrow deficiency or shortage.

44. Additionally, Mr. and Mrs. Valle informed SPS that Regulation X required it to conduct an escrow analysis on their mortgage within 60 days of a servicing transfer. But five months later, SPS still had not provided them with an escrow analysis.

45. Mr. and Mrs. Valle requested SPS correct its error by (1) conducting a proper escrow analysis, (2) updating their monthly statements to an accurate payment amount, (3) reversing any fees or charges associated with their errors, and (4) correcting any negative credit reporting associated with its errors.

V.  **SPS Decreased the Valles' Mortgage Payment in September 2024.**

46. In September 2024, still awaiting a response from SPS, Mr. and Mrs. Valle called SPS to bring their mortgage current and were told their new payment was $1,515.07.

47. SPS told Mr. and Mrs. Valle that from now on, their new monthly payment would no longer include escrow for taxes and insurance.

48. SPS provided Mr. and Mrs. Valle with a reinstatement figure of $6,282.18 to bring the

mortgage current.

49. Mr. and Mrs. Valle submitted that payment to SPS shortly thereafter and reinstated the mortgage.

50. Mr. and Mrs. Valle continued making their $1,515.07 principal and interest payments to SPS and paying their taxes and insurance separately.

51. On October 7, 2024, SPS responded to Mr. and Mrs. Valle's second notice of error and explained that it had applied the reinstatement payment to 17 outstanding payments, applied $8,531.70 to loan level advance fees, and $3,977.72 to the escrow account, but it failed to explain why the Valles payment increased by over $700 in May 2024 to $2,805.94. SPS also failed to explain why SPS told the Valles in September 2024 that their payment was $1,515.07 going forward.

52. In its response, SPS failed to provide the escrow analysis the Valles had requested and instead included an escrow disbursement history that provided them with no further explanation for the two payment changes they had been subject to.

VI. **SPS Commenced a Wrongful Foreclosure Against the Valles.**

53. Then in November 2024, SPS notified Mr. and Mrs. Valle that their monthly mortgage payment had changed for a third time, and they would now be required to pay $1,739.97, which included $225.90 in monthly escrow.

54. Mr. and Mrs. Valle contacted SPS and asked for an explanation of the third payment change in six months but could not get a clear answer.

55. Since they had already resumed paying taxes and insurance themselves, Mr. and Mrs. Valle continued making their usual payment of $1,515.07 to SPS.

56. At some point thereafter, SPS began refusing and/or returning Mr. and Mrs. Valle's

payments and on April 21, 2025, started a second foreclosure action.

### VII. The Defendants' Conduct Harmed the Valles.

52. As a result of Defendants' actions and inactions, Mr. and Mrs. Valle have suffered and continue to suffer considerable emotional distress regarding the status of their mortgage and the potential of losing their home. During the relevant period, Mr. and Mrs. Valle have experienced and continue to experience anxiety, depression, anger, frustration, restlessness, irritability, and hopelessness.

53. Mr. and Mrs. Valle feel like they have been bullied and harassed for years by the Defendants and despite their attempts to resolve escrow and payment discrepancies, they are experiencing the anguish of facing foreclosure again.

54. Mr. and Mrs. Valle have feared and continue to fear homelessness after years of having to deal with both threats of foreclosure and foreclosure actions from the Defendants. They have also experienced a loss of stability in their home life, an inability to make long-term plans, marital strain, and humiliation because of Defendants' conduct.

55. As a result of Defendants' conduct, Mr. Valle began experiencing physical manifestations of emotional distress including developing a heart condition, stomach pains, insomnia, high blood pressure, chronic fatigue, chest tightness, and chest pain. Mr. Valle was eventually prescribed medication by his doctors to address the emotional and physical distress caused by Defendants' conduct.

56. Mrs. Valle also experienced physical manifestations of emotional distress including stomach pain, muscle spasms, high blood pressure, headaches, and chronic fatigue, as a result of Defendants' conduct.

## CLAIMS FOR RELIEF

### COUNT I
(As to Nationstar Mortgage d/b/a Rushmore Servicing)

### BREACH OF CONTRACT

57. Plaintiffs incorporate by reference the allegations in Paragraphs 1-30, as if fully set forth herein.

58. On July 15, 2008, Mr. and Mrs. Valle obtained a loan secured by a mortgage from Household Realty Corporation.

59. On September 16, 2016, Household Realty Corporation assigned the Valles' note and mortgage to U.S. Bank Trust, N.A., as Trustee for LSF9 Master Participation Trust.

60. On August 2, 2017, U.S. Bank Trust, N.A., as Trustee for LSF9 Master Participation Trust assigned the Valles' note and mortgage to J.P. Morgan Acquisition Corp.

61. On March 4, 2021, J.P. Morgan Acquisition Corp. assigned the Valles' note and mortgage to CIM Trust 2020-R6.

62. On May 8, 2024, CIM Trust 2020-R6 assigned the Valles' note and mortgage to U.S. Bank Trust Company, N.A., as Trustee, as Successor-in-Interest to U.S. Bank National Association, as Indenture Trustee, For the Holders of the CIM Trust 2020-R6, Mortgage-Backed Notes, Series 2020-R6 c/o Select Portfolio Servicing, Inc.

63. Rushmore serviced Mr. and Mrs. Valle's note and mortgage from at least January 2022 till March 2024.

64. Paragraph 5 of the parties' mortgage provides that "insurance proceeds shall be applied to restoration or repair of the Property damaged, if restoration or repair is economically feasible and Lender's security is not lessened."

65. Rushmore breached the contract between the parties when it failed to provide Mr. and

Mrs. Valle with the endorsed hazard insurance check in the amount of $25,255.01 for 14 months.

66. Paragraph 18 of the parties' mortgage provides Mr. and Mrs. Valle with the right to reinstate the mortgage notwithstanding the lender's acceleration of the mortgage.

67. Rushmore breached the contract between the parties when it failed to issue a timely reinstatement when Mr. and Mrs. Valle requested it in December 2024.

68. Instead, Rushmore, acting on behalf of the lender, took three months to provide an accurate reinstatement.

69. Defendant lacked the discretion under the contract to unilaterally, willfully, negligently, and/or in bad faith disregard its terms in the face of Mr. and Mrs. Valle's compliance with their obligations thereunder.

70. As a result of Defendant's breach, Mr. and Mrs. Valle have suffered damages including, but not limited to loss of rental income, late fees, property inspection fees, and other default-related costs and fees.

## COUNT II
(As to Nationstar Mortgage d/b/a Rushmore Servicing)

### UNFAIR ACTS OR PRACTICES
**Connecticut Unfair Trade Practices Act (CUTPA), C.G.S. § 42-110a** *et seq.*

71. Plaintiffs incorporate by reference the allegations in Paragraphs 1-30 and 52-56, as if fully set forth herein.

72. Rushmore's actions were done in the conduct of trade or commerce within the State of Connecticut, as defined in Connecticut General Statutes (C.G.S.) § 42-110a(4).

73. Rushmore is a "person" within the meaning of C.G.S. § 42-110b, as defined in § 42-110a(3).

74. Rushmore continuously engaged in unfair acts or practices within the meaning of C.G.S.

§ 42-110b(a), including, but not limited to:

    a. Wrongfully withholding insurance funds for over a year, even after receiving the documentation it requested of the Plaintiffs to facilitate the release;

    b. Providing false reasons for its failure to release the insurance funds, including "borrower unresponsiveness" despite Plaintiffs' documented communication with both Rushmore and its foreclosure counsel;

    c. Delaying release of the insurance funds, which prolonged water damage to the property and caused the Plaintiffs loss of rental income;

    d. Taking three months to provide Plaintiffs a reinstatement figure, despite formal written requests and in violation of C.G.S. § 49-10a, which requires a mortgagee provide a reinstatement within seven business days;

    e. Causing Plaintiffs additional credit damage and default-related fees by delaying the reinstatement; and

    f. Failing to mediate in good faith within the foreclosure mediation program, and instead causing delays, contradicting its statements, and forcing Plaintiffs to duplicate their efforts to resolve the default;

75. Rushmore's actions have offended public policy, including standards set forth in the parties' note and mortgage, C.G.S. § 49-10a regarding payoff and reinstatement requests, and Connecticut's foreclosure mediation statute, C.G.S. § 49-31, which are all regulations Rushmore was subject to at all relevant times.

76. Rushmore's continuing unfair conduct in servicing Mr. and Mrs. Valle's mortgage was willful, immoral, unscrupulous, unethical, and oppressive, and caused substantial injury to them that they could not have reasonably avoided. Mr. and Mrs. Valle have improperly incurred late fees, property inspection fees, and other default-related costs and fees, as well as damage to their credit, and loss of rental income. This substantial injury was not outweighed by any countervailing benefits to consumers that Rushmore's conduct produced.

77. As a result of Rushmore's unfair actions and inactions, Mr. and Mrs. Valle also suffered and continue to suffer considerable emotional distress regarding the status of their mortgage and

11

the potential of losing their home as described in paragraphs 52-56.

78. A copy of this pleading will be electronically mailed to the Attorney General and the Commission of Consumer Protection pursuant to Connecticut General Statutes Section 42-110g(c) shortly after filing.

## COUNT III
(As to Select Portfolio Servicing)

**VIOLATION OF RESPA AND REGULATION X, 12 C.F.R § 1024.35**

79. The Plaintiff incorporates by reference the allegations in Paragraphs 1-16 and 31-56, as if fully set forth herein.

80. On May 29, 2024, Mr. and Mrs. Valle submitted their first qualified written request (QWR) to SPS. Their request included a notice of error, as defined by Reg. X, 12 C.F.R. § 1024.35(b), and a request for information, as defined by Reg. X, 12 C.F.R. § 1024.36(a).

81. In the first QWR, Mr. and Mrs. Valle notified SPS that it had miscalculated their monthly escrow payment, improperly increased their monthly mortgage payment, and failed to conduct an escrow analysis after taking over servicing of their mortgage.

82. Mr. and Mrs. Valle requested SPS resolve the errors by:

    a. conducting an escrow analysis immediately to determine their appropriate mortgage payment;

    b. reversing any fees or charges associated with error; and

    c. correcting any negative credit reporting associated with the error.

83. Mr. and Mrs. Valle also requested information regarding their mortgage account including: an updated escrow balance, an updated escrow analysis, a complete transaction record for the account, and any communications sent from Rushmore to SPS regarding the escrow account.

84. On July 31, 2024, SPS responded to Mr. and Mrs. Valle and claimed that:

12

    a. The payment increase was caused by a negative escrow balance of $25,255.01 that existed at the time of servicing transfer to SPS;

    b. The monthly mortgage payment amount in effect at the time of transfer from Rushmore to SPS was $2,805.91 and that escrow portion of that was $1,514.07, which included taxes, insurance, and escrow shortage; and

    c. It would send Mr. and Mrs. Valle an updated escrow analysis under a separate cover, which would update the payment based on the current escrow account deficiency of $2,710.80.

85. SPS violated RESPA requirements for a QWR by failing to 1) conduct a reasonable investigation in response to the escrow error the Valles complained of and 2) provide the Valles with the loan information they requested.

86. By July 31, 2024, SPS had fully processed Mr. and Mrs. Valle's reinstatement, and upon a reasonable investigation should have been able to provide an escrow analysis and explained to the Valles why their payment kept changing.

87. Additionally, SPS failed to provide Mr. and Mrs. Valle with the requested complete transaction record for the account and updated escrow analysis.

88. On August 15, 2024, still confused regarding their mortgage status, Mr. and Mrs. Valle sent SPS a second QWR. Their request included a notice of error and a request for information.

89. Mr. and Mrs. Valle informed SPS that the reinstatement payment they had submitted to Rushmore on March 22, 2024, included all outstanding principal, interest, escrow payments, and corporate advances, and should have fully funded any existing escrow shortage or deficiency.

90. Mr. and Mrs. Valle again informed SPS that it had erred in servicing their loan account by increasing their monthly mortgage payment shortly after the reinstatement.

91. The Valles requested, for a second time, that SPS resolve the errors by:

    a. Conducting an escrow analysis;

    b. Updating their billing statements to reflect an accurate payment;

    c. Reverse any fees or charges associated with the errors; and

    d. Correct any negative credit reporting associated with the errors.

92. Mr. and Mrs. Valle again requested information regarding their mortgage account including: a full account history from January 1, 2021 until present and an itemized statement showing all costs and fees assessed to the loan account for the life of the loan.

93. On October 7, 2025, SPS responded to the Valles second QWR indicating, among other things, that SPS applied the reinstatement funds to 17 outstanding payments, $8,531.70 to loan level advance fees, and $3,977.72 to their escrow account.

94. SPS provided Mr. and Mrs. Valle with the requested transaction history, but only for the period of March 8, 2024 until May 31, 2024, not dating back to January 1, 2021, as they had requested.

95. SPS also failed to provide the Valles with an itemized statement showing all costs and fees assessed to the loan account for the life of the loan. And instead, only provided an itemization of the costs and fees assessed to their account from March 8, 2024 until September 11, 2024.

96. SPS violated RESPA a second time, by failing to 1) conduct a reasonable investigation in response to the escrow error the Valles complained of and 2) provide the Valles with the loan information they requested, including an updated escrow analysis.

97. SPS also violated RESPA by failing to respond to the Valles' second QWR within the applicable statutory time limit of 30 business days.

98. SPS's actions were part of a pattern and practice of noncompliance, as described by 12

U.S.C. § 2605(e). This pattern and practice is exemplified in SPS's inability to properly respond to the Valles' two QWRs, and by the 347 complaints the CFPB has received from homeowners in the last three years related to SPS's mismanagement of escrow accounts, misapplication of payments, and failure to provide homeowners with accurate loan account information.

99. As a direct, proximate, and foreseeable result of SPS's non-compliance with their obligations under RESPA and Regulation X, Mr. and Mrs. Valle have suffered actual damages, including but not limited to late fees, property inspection fees, attorney's fees and costs related to the 2025 foreclosure action, and other default-related costs and fees.

100. As a result of SPS's actions and inactions, Mr. and Mrs. Valle also suffered and continue to suffer emotional distress as described in paragraphs 52-56.

101. SPS is also liable to Mr. and Mrs. Valle for statutory damages of $2,000 per violation pursuant to 12 U.S.C. § 2605(f)(1)(B), given its pattern or practice of noncompliance with RESPA.

## COUNT IV
(As to Select Portfolio Servicing)

**UNFAIR ACTS OR PRACTICES**
**Connecticut Unfair Trade Practices Act (CUTPA), C.G.S. § 42-110a** *et seq.*

102. The Plaintiff incorporates by reference the allegations in Paragraphs 31-56, and 79-101 as if fully set forth herein.

103. SPS's actions were done in the conduct of trade or commerce within the State of Connecticut, as defined in Connecticut General Statutes (C.G.S.) § 42-110a(4).

104. SPS is a "person" within the meaning of C.G.S. § 42-110b, as defined in § 42-110a(3).

105. SPS continuously engaged in unfair acts or practices within the meaning of C.G.S. § 42-110b(a), including, but not limited to:

    a. Changing Plaintiffs' monthly mortgage payment three times in 7 months, confusing the Plaintiffs, and causing their eventual default;

    b. Sending Plaintiffs conflicting mortgage statements with different payment amounts due from April 2024 onward;

    c. Failing to accurately explain mortgage payment changes to Plaintiffs;

    d. Refusing and returning Plaintiffs mortgage payments;

    e. Failing to clarify, upon Plaintiffs' requests, why it was refusing or returning Plaintiffs' mortgage payments;

    f. Misrepresenting to Plaintiffs that their new payment would be $1,515.07, and that their taxes and insurance would no longer be escrowed, only to increase their payment and add an unexplained escrow item two months later;

    g. Failing continuously to provide Plaintiffs accurate information about their loan;

    h. Failing to substantively respond to Plaintiffs notices of errors under RESPA and Regulation X;

    i. Failing to provide Plaintiffs an escrow analysis within 60 days of starting to service their mortgage in violation of 12 C.F.R. § 1024.17(e)(1)(i);

    j. Continuing to use outdated or incorrect escrow estimates and in doing so providing Plaintiffs with conflicting and confusing account information;

    k. Demanding escrow when it informed Plaintiffs in September 2024 that the account was to be non-escrowed;

    l. Starting a wrongful foreclosure against the Plaintiffs in April 2025;

106. SPS's actions have offended public policy, including standards set forth in the parties' note and mortgage and RESPA, Regulation X.

107. SPS has at all relevant times been subject to RESPA and mortgage servicing rules under Regulation X.

**SPS's Unfair Conduct Offends Public Policy as Established by Regulation X.**

108. Regulation X represents a public policy of promoting fairness for consumers in the mortgage servicing industry. In other words, Regulation X was promulgated in order to make mortgage servicing fairer to consumers. Based on the foregoing, violations of RESPA and Regulation X are an established concept of unfairness.

109. SPS's conduct shows a general disregard for 12 C.F.R. § 1024.38, which requires

16

servicers to maintain policies and procedures that are reasonably designed to ensure a servicer can:

    a. Access and provide timely and accurate information, including accurate and timely disclosures to a borrower; and

    b. Investigate, respond to, and as appropriate, make corrections in response to complaints asserted by the borrower.

110. As detailed in paragraph 105, SPS consistently failed to provide timely and accurate loan information to Mr. and Valle, even when they complained via notices of error under Regulation X.

111. SPS also violated 12 C.F.R. § 1024.17(e)(1)(i), which requires a new servicer "conduct an initial escrow account analysis to determine the monthly escrow payment and shortage or surplus, if any, in the escrow account."

112. SPS violated 12 C.F.R. § 1024.35 and 1024.36, twice, in July 2024 and October 2024, by failing to: 1) conduct a reasonable investigation in response to the escrow error the Valles complained of and 2) provide the Valles with the loan information they requested, including an updated escrow analysis and itemized statement showing all costs and fees assessed to the loan account for the life of the loan.

113. SPS's continuing unfair conduct in servicing Mr. and Mrs. Valle's mortgage was willful, immoral, unscrupulous, unethical, and oppressive, and caused substantial injury to them that they could not have reasonably avoided. Mr. and Mrs. Valle have improperly incurred late fees, property inspection fees, and other default-related costs and fees, as well as damage to their credit. This substantial injury was not outweighed by any countervailing benefits to consumers that SPS's conduct produced.

114. As a result of SPS's unfair actions and inactions, Mr. and Mrs. Valle also suffered and continue to suffer considerable emotional distress regarding the status of their mortgage and the potential of losing their home.

115. A copy of this pleading will be electronically mailed to the Attorney General and the Commission of Consumer Protection pursuant to Connecticut General Statutes Section 42-110g(c) shortly after filing.

## PRAYER FOR RELIEF

Plaintiffs Herminio and Luz Valle respectfully request that judgment be entered against Defendants for the following:

   i. Actual damages, compensatory damages, and costs and reasonable attorney's fees pursuant Conn. Gen. Stat. § 42-150bb to as to Count I;

   ii. Actual damages, compensatory damages, and attorney's fees, pursuant to Conn. Gen. Stat. § 42-110g(a) and (d), as to Counts II and IV;

   iii. Actual damages, statutory damages, and attorney's fees pursuant to 12 U.S.C. § 2605(f) as to Count III;

THE PLAINTIFFS
HERMINIO AND LUZ VALLE

/s/ Loraine Martinez Bellamy
Loraine Martinez Bellamy (ct29220)
Connecticut Fair Housing Center
60 Popieluszko Court
Hartford, CT  06106
T: (860) 263-0732
F: (860) 247-4236
lmartinez@ctfairhousing.org